**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
JANET D'IORIO,

                Plaintiff,

        -against-

WINEBOW, INC.,

                Defendant.
--------------------------------------------------------X

                                    **MEMORANDUM OF**
                                    **DECISION & ORDER**
                                    12-cv-1205 (ADS)(ARL)

<u>**APPEARANCES:**</u>

**Leeds Brown Law, P.C.**
*Attorneys for the Plaintiff*
One Old Country Road, Suite 347
Carle Place, NY 11514
        By: Rick Ostrove, Esq.
            Bryan L. Arbeit, Esq., Of Counsel

**Seyfarth Shaw LLP**
*Attorneys for the Defendant*
620 Eighth Avenue
New York, NY 10018
        By: Robert Steven Whitman, Esq.
            Barbara H. Borowski, Esq.
            Scott Roblan Rabe, Esq., Of Counsel

**SPATT, District Judge**.

On March 12, 2012, the Plaintiff Janet D'Iorio (the "Plaintiff") commenced this action by

filing a Complaint against the Defendant Winebow, Inc. (the "Defendant"). The action sought

statutory, injunctive, and equitable relief relating to the Defendant's alleged failure to disclose

plan documents and its affirmative and/or negligent misrepresentation of benefits under its long-

term disability and life insurance plan governed by the Employee Retirement Income Security

Act of 1974 ("ERISA"). Specifically, the Plaintiff asserted (1) a cause of action under ERISA §

502(c)(1), 29 U.S.C. § 1132(c)(1), for the Defendant's alleged failure to provide or comply with

a request for information by a participant or beneficiary, which a plan administrator is required to furnish and (2) a cause of action under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), to redress alleged violations by the Defendant of fiduciary and statutory duties under ERISA.

On January 18, 2013, the Court granted the Defendant's motion pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 12(b)(6) to dismiss the Plaintiff's first cause of action under ERISA § 502(c)(1) and denied the Defendant's motion with respect to its second cause of action under ERISA § 502(a)(3).

Presently before the Court is the Defendant's motion for (i) summary judgment pursuant to Fed. R. Civ. P. 56(a) to dismiss the Plaintiff's remaining cause of action under ERISA § 502(a)(3); or (ii) in the alternative, to limit the Plaintiff's damages at trial pursuant to Fed. R. Civ. P. 56(g). For the reasons set forth below, the motion is denied in part and granted in part.

## I. BACKGROUND

Unless stated otherwise, the following facts are drawn from the parties' Rule 56.1 statements. Triable issues of fact are noted.

### A. The Underlying Facts

#### 1. The Plaintiff's Compensation

In 1997, the Plaintiff began working as a sales representative for the Defendant. Before being employed by the Defendant, the Plaintiff had a history of chronic pain related to her neck and back. (D'Iorio Dep. Tr. 102:16–20.) The parties do not set forth the Plaintiff's age or marital status.

The Defendant is a New Jersey corporation, which has its primary place of business in New Jersey. (Compl. at ¶ 5.) The parties do not make clear the precise nature of the Defendant's business.

Pursuant to the Plaintiff's March 26, 2008 and October 1, 2009 employment contracts with the Defendant, the Plaintiff's compensation was based on "[r]ecoverable draw against commission: $60,000.00 per annum, paid bi-weekly." (Whitman Decl., Ex. 6; Ostrove Decl., Ex. 36.)

Under this policy, the Plaintiff received bi-weekly checks based on a salary of $60,000, referred to as her recoverable draw. The Plaintiff's recoverable draw did not include commissions. (Id.) In this regard, if the Plaintiff's commissions were less than her recoverable draw in a given month, she would start the following month owing the Defendant money and would have to earn additional commissions to "make it up." (D'Iorio Dep. 230:9–19; Delvin Dep. 9:20–24.) If in a given month, the Plaintiff earned commissions in excess of her recoverable draw, then she would receive an "additional check" for an unspecified amount. (Delvin Dep. 9: 10–14.) In 2008 and 2009, the two years prior to when she went on disability leave in 2010, the Plaintiff earned $110,000 and $112,000, respectively. (D'Iorio Dep. Tr. 241:2–13.) Her compensation in 2008 and 2009 was therefore significantly higher than her recoverable draw of $60,000.

Under the Defendant's compensation policy, an employee could submit a request to her supervisor to change her "recoverable draw." A party's request was only granted if approved by the sales representative's supervisors and senior management.

However, the parties dispute whether the Defendant had a policy in place that precluded employees from increasing their recoverable draw above a certain amount. Both parties agree that there was no written policy relating to a maximum recoverable draw. (Response to the Pl.'s. Req. for Admission at 6, Ostro. Decl., Ex. 27.) However, the Defendant alleges that there was an oral policy that the maximum amount that a commissioned sales employee could increase her

recoverable draw to was 80 percent of 5.5 percent of that employee's prior year sales. (Edelstein Decl. at ¶ 5; Delvin Dep. Tr. 10:6–8.) According to the Defendant, it enforced this policy "rigidly," so that an employee could only alter her recoverable draw above the maximum amount under "extraordinary circumstances." (Edelstein Dep. Tr. 32:3–6.) The Defendant does not make clear the meaning of "extraordinary circumstances."

On the other hand, the Plaintiff disputes that the Defendant had an oral policy that prevented employees from raising their recoverable draw above a certain amount. (See Delvin Dep. Tr. 10:6–10; Ostro Decl., Ex. 13.) She asserts that an employee could seek permission from her supervisor to increase her recoverable draw at any time and for any reason.

**2. The Employee Handbook**

The Defendant provides its employees with certain benefits, including a long term disability plan (the "LTD Plan"). Generally, a company's LTD Plan provides benefits in the form of compensation checks to employees in the event that they are disabled by an accident or an illness. (Whitman Decl., Ex. Q, at 62.) The Defendant is the Plan Administrator and named fiduciary of its LTD Plan.

On June 1, 2008, the Defendant revised its Employee Handbook. In a section entitled, "Long Term Disability Insurance," the 2008 Employee Handbook states:

> If you are a regular full-time employee of the Company, you are protected through a long-term disability insurance policy from financial hardship if you are totally disabled because of illness or accident that is not job related. Coverage amounts are defined in the Summary Plan Descriptions (SPD's) provided by the insurance company. The Summary Plan Descriptions can be found on the Intranet under Human Resources or directly from the Human Resources Department. Long term disability benefits begin after 180 days of total disability and provide you with a % of your annual salary.

(Whitman Decl., Ex. Q, at 62.)

4

The Defendant operated an "Intranet" site, known as "Sharepoint," which is an internal company website that the Defendant made available to its employees to access certain documents related to their benefits, including summary plan descriptions. Summary plan descriptions ("SPDs") are documents provided by insurance companies that describe the benefits available to employees.

On June 12, 2008, the Plaintiff signed a form acknowledging that she had "received and read a copy of the Company Employee Handbook." (Whitman Decl., Ex. B, at 146–47.)

On May 18, 2009, the Defendant revised the Employee Handbook again but left the section entitled, "Long Term Disability Insurance" the same. On June 4, 2009, the Plaintiff signed another form acknowledging that she had "received and read a copy of the Company Employee Handbook." (Whitman Decl. at Ex. S.) The Plaintiff also saved copies of the 2008 and 2009 Employee Handbooks on her computer.

### 3. The December 1, 2008 PowerPoint Presentation

The Defendant held "Open Enrollment meetings" for its employees several times a year to provide an overview of certain benefits available to its employees. The parties dispute whether at these meetings, the Defendant generally directed its employees to the Company's intranet site for copies of the benefit plans and SPDs.

In addition, when the Defendant made changes to its employees' benefits, Michelle Edelstein ("Edelstein"), the Defendant's Vice President of Human Resources, would send communications to employees regarding those changes.

Prior to 2009, the Defendant used United of Omaha Life Insurance Company ("United of Omaha") as its insurance carrier for the LTD Plan. Under the United of Omaha's LTD plan, if an employee qualified for the LTD Plan because of an injury, he or she would receive a

"monthly benefit" or check for a certain amount of money.  (Ostrove Decl., Ex. 32, at 1.)  The

"monthly benefit" was "60% of [an employee's] Basic Monthly Earnings up to a maximum

benefit of $5,000 per month."  (Id. at 1.)  The United of Omaha LTD plan defined "Basic

Monthly Earnings" as "gross income received from [the Defendant] for the month immediately

prior to the month in which [the employee's] disability began."  (Ostrove Decl., Ex. 32, at 2.)

Significantly, under this plan, an employee's gross income "include[d] commissions received

[from the Defendant]."  (Id.)

In 2008, the Defendant changed its insurance carrier for its LTD Plan from United of

Omaha to Unum Life Insurance Company of America ("Unum").  The change would become

effective as of January 1, 2009.  As is described in more detail below, the Unum Plan calculated

employees' monthly benefit payments under the LTD Plan based on their recoverable draw and

not their gross earnings, including commissions.

Prior to the effective date, the Defendant held presentations regarding the changes to its

benefits, including the LTD Plan.  In particular, in a November 26, 2008 email to sales

employees, Edelstein stated that the "2009 Benefit Enrollment Meeting" was scheduled for

December 1, 2008.  (Edelstein Decl., Ex. AA.)  Edelstein attached to the email a copy of a

PowerPoint presentation to be given at the meeting and asked the employees to "either print it

out or have it up on your computer so that you can read along as we present the benefit plans for

2009."  (Id.)  In the email, Edelstein also attached an "UNUM . . . Long Term Disability Election

Form[]."  (Id.)  The Plaintiff received the email and attachments.  (D'Iorio Decl. at ¶ 2.)

The PowerPoint presentation was prepared by Mercer Health Benefits LLC ("Mercer"), a

third party hired by the Defendant.  However, Edelstein reviewed and approved it. (Edelstein

Dep. Tr. 37:11–25.)

The PowerPoint presentation consisted of forty-one slides relating to the different benefit plans offered by the Defendant to its employees. (Edelstein Decl., Ex. AA.) One of the slides was entitled, "Short and Long Term Disability." (Id.) Under a section of the slide entitled, "Long Term Disability," there were four bullets, which stated: (i) "66 2/3 % of monthly earnings to a maximum of $15,000 per month"; (ii) "Survivor Benefit"; (iii) "Dependent Care Benefit"; and (iv) "Paid by [the Defendant] at no cost to you." (Id.) However, the slides did not define the meaning of "earnings," nor did any of the slides direct employees to the Defendant's intranet site to obtain a copy of the plans or SPDs for the benefits discussed at the presentation. (Id.)

The "UNUM Long Term Disability Election Form" required each employee to indicate whether he or she elected to (i) pay the premium for the LTD Plan on a "payroll deduction basis"; or (ii) not to pay the premium for the LTD Plan. (Ostrow Decl., Ex. 2.) Under the first option, the disability benefits claimed by the employee would not be subject to federal income tax. (Id.) However, under the second option, the Defendant would pay the premiums on the policy for the employee but any disability benefits later claimed by the employee would be subject to the federal income tax. (Id.)

On December 1, 2008, the Defendant held the scheduled meeting during which the PowerPoint presentation attached to the November 26, 2008 email was given. The Plaintiff attended the meeting. (D'Iorio Decl. at ¶ 2.) Edelstein was also present during the meeting. (Edelstein Dep. Tr. 37:11–25.) The parties dispute whether Edelstein or a representative of Mercer presented the PowerPoint presentation. (Edelstein Dep. 37:2–9; the Def.'s Memo of Law, at 16.) A copy of the SPD of the LTD plan was not provided at the meeting. (Edelstein Dep. Tr. 37:11–25.)

Following the meeting, the Plaintiff filled out the "UNUM Long Term Disability Election Form" attached to Edelstein's November 26, 2008 email. The Plaintiff chose the first option pursuant to which the premiums for the LTD Plan were deducted directly from her pay check every two weeks.

The amount deducted per pay check was determined by the formula ".00847% of [the employee's] annual salary." This formula was not provided to employees in the documents contained in Edelstein's November 26, 2008 email.

However, in a December 22, 2009 email to various sales employees, Erin McGuinness ("McGuinness"), a member of the Defendant's Human Resources department, attached a document entitled, "Summary of Health and Welfare Benefits Effective January 1, 2010." (Whitman Decl., Ex. K.) The document stated, "Long Term Disability starts after 180 days of total disability and pay[s] 66 2/3 % of your base salary." (Id.) In addition, the document stated, "If you are interested in calculating the premium costs, you can do so by using the following formula . . . Current Annual salary/26/100 * 0.22[.] For example, $30,000/26/100 * = $2.54 per pay period." (Id.)

Pursuant to this formula, beginning on January 1, 2009, $5.08 was deducted from each of the Plaintiff's pay checks. Given that it was a "nominal amount," the Plaintiff testified that she never thought to use this calculation to determine the "Current Annual Salary" that was being used by the Defendant to calculate her premium payments. (D'Iorio Decl. at ¶ 4.)

### 4. The Summary Plan Description of the LTD Plan

The SPD of the 2009 Unum LTD Plan provides information and answers to questions regarding the eligibility requirements for the plan and the benefits available to employees. (Whitman Decl., Ex. I.) Under a heading entitled, "What are your monthly earnings," the SPD

states: " 'Monthly Earnings' means your gross monthly income from your Employer in effect just prior to your date of disability . . . . It does not include additional income received from commissions, bonuses, overtime pay, any other extra compensation, or income received from sources other than your Employer." (Id.)

The parties dispute whether the Defendant made the SPD for the 2009 Unum LTD plan available to the Plaintiff at any time prior to or following the December 1, 2008 presentation. In this regard, the Defendant asserts that the SPD of the 2009 Unum LTD Plan was mailed to all employees, including the Plaintiff, and was available on SharePoint. (McGuinness Dep. Tr. 15:23–16:5; Edelstein Decl. at ¶ 3.) On the other hand, Plaintiff asserts that she did not receive the SPD of the 2009 Unum LTD Plan in the mail and that she did not have access to the company's SharePoint site. (D'Iorio Tr. 151:17–22; 152:24–153:13.) However, the Plaintiff admits that prior to applying for benefits under the LTD Plan in 2010, she never sought access to SharePoint to review the LTD Plan.

### 5. The Plaintiff's Injury and Application for LTD Benefits

In January 2010, the Defendant held Open Enrollment meetings where it used the same PowerPoint presentation delivered on December 1, 2009.

Also in January 2010, following the presentation, the Plaintiff was injured after falling in her garage. (D'Iorio Dep. Tr. 102:23–103:7.) The parties do not set forth the precise date in January when the Plaintiff was injured. After the injury, the Plaintiff was taken to the emergency room and given X-rays to her hands, wrists, and legs. (Id. at 103:10–18.) As a result of the fall, she suffered "some torn ligaments" in her foot, pain in her hands and wrists, and exacerbated her pre-existing injuries to her neck and back. (Id. at 102:11–103:24.)

On January 21, 2010, the Plaintiff emailed Lori Delvin ("Delvin"), her direct supervisor, to inquire about the scope of her benefits under the Unum LTD Plan. Devlin responded:

> Erin [McGuiness] [] sent me a 45 page document but asked me not to forward as different employees fall under different plans based on salary level and other such things . . . . If you continue to feel this bad you should probably ask for a copy of your plan, it is hard for me to know the difference would be. The percentage of salary on Long Term on mine is 66.67%, but since reps are on commission I do not know if there would be a difference in how they calculate the numbers.

(Whitman Decl., Ex. V.)

On March 2, 2010, the Plaintiff emailed McGuiness requesting "information that was handed out awhile ago on LTD benefits and criteria." (Ostrove Decl., Ex. 7.) On the same day, McGuiness responded, consistent with the PowerPoint presentation, that the "monthly benefit" was "66.6667% of monthly earnings to a maximum benefit of $15,000 per month." (Ostrove Decl., Ex. 9.)

In a March 11, 2010 email to McGuinness, Nancy Duca ("Duca"), another employee of the Defendant's Human Resources Department, asked, "Janet D'Iorio is looking for LTD information. Is it okay to send her this?" McGuinness responded to Duca, "She is looking for the plan document . . . . If she needs it now-before I send [it] to her, it is on Sharepoint: Unum disability plan document." (Ostrove Decl., Ex. 8.)

On April 5, 2010, the Plaintiff began a short-term disability leave. Pursuant to the Unum LTD Plan, the Plaintiff could only apply for benefits under the LTD Plan after being on short-term disability for a mandatory 180 day period.

On September 10, 2010, after the expiration of the 180 day period, the Plaintiff submitted an application to Unum for benefits under the LTD Plan. Thereafter, the Human Resources Department discussed how to calculate her monthly benefit under the LTD Plan. In particular, in a September 29, 2010 email to Edelstein, Delvin wrote:

Michele, I know that you are aware of the situation that occurred with Janet's long-term disability, but as a recap, [the] disability insurance contract apparently reflected her draw and did not account for the substantial overage that she earned every year [in commission]. As you know this represents a huge difference in income for her going forward. I do not recall hearing that this was how the calculations were being done when we have had benefits presentations. It would have been very easy to have had her draw raised. For the future, I think that we need to develop a standard formula to calculate commissioned reps['] draw. Many of them do not ask for an increase as they earn more money since they do get a[n] overage check each month. Since many of them are paying their own premium, it would not cost the company anything to insure that each of them has the top level of protection for which they can qualify. I hope that this is something that we can consider.

(Ostrove Decl., Ex. 13.)

On the same day, Edelstein responded:

Everyone is told when they start that the policy taken out is one times their draw. If you want to adjust draw up from time to time, it must be submitted to Mike Espo and approved by Frank. Otherwise if a situation arises where someone passes away or goes out on LTD, the payment will be based on the draw amount.

(Id.)

By letter dated November 2, 2010, Unum advised the Plaintiff that it had approved her application for benefits under the LTD Plan. According to the letter, the Plaintiff was to receive a gross benefit under the LTD Plan of $3,333.34 per month, less $1,915.00 in Primary Social Security and $956.00 in Family Social Security, for a net payment from the LTD plan of $462.34 per month. Unum calculated her gross benefit by applying a formula of 66.67% of her "salary." The Plaintiff later learned after a discussion with Edelstein and Duca that her "salary" was based solely on her recoverable draw, and did not include the commissions she received. As such, for purposes of determining her benefits under the LTD Plan, her "salary" was $60,000 even though she had earned in excess of $100,000 in 2008 and 2009 because of additional commissions.

**B. Procedural History**

On March 12, 2012, the Plaintiff commenced this action. She alleged: (1) a cause of action under ERISA § 502(c)(1), 29 U.S.C. § 1132(c)(1), for the Defendant's alleged failure to provide or comply with a request for information by a participant or beneficiary, which a plan administrator is required to furnish; and (2) a cause of action under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), to redress alleged violations by the Defendant of duties under ERISA.

On January 18, 2013, the Court granted the Defendant's motion to dismiss the Plaintiff's first cause of action under ERISA § 502(c)(1) without prejudice and denied the Defendant's motion with respect to its second cause of action under ERISA § 502(a)(3). However, the Court found that the only remedy available for the Plaintiff's claim under ERISA § 502(a)(3) was a "surcharge remedy" and not the remedy of estoppel or reformation. (Memorandum of Decision & Order, Jan. 18, 2013, at 17.)

The Plaintiff did not file an amended complaint, and therefore the Plaintiff's only remaining cause of action is its claim pursuant to ERISA §502(a)(3). In this regard, the Plaintiff claims that the Defendant breached a fiduciary duty to the Plaintiff because the Defendant (i) failed to provide the Plaintiff with an SPD; and (ii) made misrepresentations regarding the Plaintiff's benefits under its LTD Plan. In the present motion, the Defendant argues that there are no genuine issues of fact, and it is entitled to judgment as a matter of law on both of the Plaintiff's theories of liability. In the alternative, the Defendant seeks an order pursuant to Fed. R. Civ. P. 56(g) limiting the Plaintiff's relief.

The Defendant also argues that to the extent that the Plaintiff claims that the SPD itself was not sufficient, her claim lacks merit. In her opposition papers, the Plaintiff did not respond to this aspect of the Defendant's argument, and as such, the Court dismisses the Plaintiff's

ERISA claim to the extent that it relies on allegations that the SPD itself is not sufficient. See, e.g., Levy v. Maggiore, No. 13-CV-2219 (MKB), 2014 WL 4803936, at *13 (E.D.N.Y. Sept. 29, 2014) ("Plaintiff does not respond to this argument and the Court therefore construes Plaintiff's failure to respond as an abandonment of this claim."); Perceptron, Inc. v. Silicon Video, Inc., No. 5:06-CV-0412 (GTS), 2010 WL 3463098, at *2 (N.D.N.Y. Aug. 27, 2010) ("Similarly, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law (submitted in support of its motion for summary judgment), the non-movant is deemed to have 'consented' to the legal arguments contained in that memorandum of law under Local Rule 7.1(b) (3).").

## II. DISCUSSION

### A.  Legal Standards

Pursuant to Fed. R. Civ. P. 56(a), a court may grant summary judgment when the "movant shows there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law."  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.'"  James River Ins. Co. v. Power Mgmt., Inc., No. 12-CV-02706 (ADS), 2014 WL 5460548, at *4 (E.D.N.Y. Oct. 28, 2014) (Spatt, J.) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986)).

If the movant successfully demonstrates that there is no genuine issue of material fact, then the burden shifts to the non-movant who must come forward with specific facts showing

that a genuine issue exists.  See Major League Baseball Properties, Inc. v. Salvino, Inc., 542 F.3d 290, 310 (2d Cir. 2008).

A genuine issue of material facts exists if "'a reasonable jury could return a verdict for the nonmoving party.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).  In determining whether a genuine dispute of material fact exists, a court "must resolve all ambiguities and draw all justifiable factual inferences in favor of the party against whom summary judgment is sought."  Buckley v. Deloitte & Touche USA LLP, 888 F. Supp. 2d 404, 415 (S.D.N.Y. 2012) aff'd, 541 Fed App'x 62 (2d Cir. 2013).  However, a party "opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory" or "based on speculation." Id. (citations omitted).  Rather, the nonmoving party must "affirmatively 'set out specific facts showing a genuine issue for trial[.]'"  Safa v. Deutsche Lufthansa Aktiengesellschaft, Inc., No. 12-CV-2950 (ADS), 2014 WL 4274071, at *5 (E.D.N.Y. Aug. 28, 2014) (Spatt, J.) (quoting Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998)).  "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper."  Id. (quoting Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994)).

## B.  As to Whether the Defendant Met Its Disclosure Obligations Under ERISA

The Plaintiff asserts that the Defendant violated ERISA's statutory and regulatory requirements by failing to furnish the Plaintiff with a copy of the SPD for the Unum LTD Plan within 90 days of that policy becoming effective.

**1. Legal Standard**

Section 104(b)(1)(A) of ERISA requires a plan administrator to "furnish to each participant . . . [with] a copy of the summary plan description [SPD] . . . (A) within 90 days after he becomes a participant." 29 U.S.C. § 1024(b)(1)(A).  In fulfilling this requirement, a plan administrator has a "duty to provide an SPD to its participants setting forth information such as the name and type of benefit plan, the plan's requirements with respect to eligibility for participation and benefits, and circumstances that may result in disqualification, ineligibility, or denial or loss of benefits."  Weinreb v. Hosp. For Joint Diseases Orthopaedic Inst., 404 F.3d 167, 170 (2d Cir. 2005) (citing 29 U.S.C. §§ 1021(a), 1022, 1024(b)); see also Watson v. Consol. Edison Co. of N.Y., 374 Fed. Appx. 159, 163 (2d Cir. 2010) ("ERISA requires plan administrators to provide a SPD to its participants setting forth certain information and to 'make reasonable efforts to ensure each plan participant's actual receipt of the plan documents.'") (quoting Weinreb v. Hosp. for Joint Diseases Orthopaedic Inst., 404 F.3d 167, 170 (2d Cir. 2005)).  This provision was enacted to "ensur[e] that the individual participant knows exactly where he stands with respect to the plan[.]" Leyda v. AlliedSignal, Inc., 322 F.3d 199, 208 (2d Cir. 2003) (quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 118, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)) (internal quotation marks omitted).

If a plan administrator violates this provision, Section 502(a)(1) of ERISA empowers plan participants and beneficiaries to bring civil actions against plan fiduciaries for any damages that result from the failure to properly disclose the SPD.  Wilkins v. Mason Tenders Dist. Council Pension Fund, 445 F.3d 572, 583 (2d Cir. 2006) ("And, as decisions of this court have made clear, 'if a summary plan is inadequate to inform an employee of his rights under the plan, ERISA empowers plan participants and beneficiaries to bring civil actions against plan

fiduciaries for any damages that result from the failure to disclose' under 29 U.S.C. § 1132(a)(1)(B).") (quoting <u>Layaou v. Xerox Corp.</u>, 238 F.3d 205, 212 (2d Cir. 2001).

The Department of Labor issued rules and regulations for how to satisfy section 104(b)(1)(A) of ERISA. In particular, section 2520.104b–1 of the Rules and Regulations for Reporting and Disclosure under ERISA, 29 C.F.R. § 2520.104b–1(b)(1), provides that in "furnishing" a SPD to each participant under the plan, the plan administrator "shall use measures reasonably calculated to ensure actual receipt of the material by plan participants, beneficiaries and other specified individuals. Material which is required to be furnished to all participants covered under the plan and beneficiaries receiving benefits under the plan (other than beneficiaries under a welfare plan) must be sent by a method or methods of delivery likely to result in full distribution." 29 C.F.R. § 2520.104b-1.

For example, "in-hand delivery to an employee at his or her worksite is acceptable." <u>Id.</u> In addition, distribution of an SPD through "first, second, or third-class mail" may be sufficient to satisfy ERISA's disclosure requirements. 29 C.F.R. § 2520.104b-1 ("[D]istribution by second or third-class mail is acceptable only if return and forwarding postage is guaranteed and address correction is requested. Any material sent by second or third-class mail which is returned with an address correction shall be sent again by first-class mail or personally delivered to the participant at his or her worksite."); <u>see also</u> <u>Hall v. Kodak Ret. Income Plan</u>, No. 07-CV-6169 (MAT), 2009 WL 778102, at *8 (W.D.N.Y. Mar. 20, 2009) ("Materials distributed through the mail may be sent by first class mail[.]").

The plan administrator may also satisfy the ERISA disclosure requirement by furnishing SPDs through "electronic media." However, in doing so, the Plaintiff must also take "appropriate and necessary measures reasonably calculated to ensure . . . actual receipt of

transmitted information (e.g., using return-receipt or notice of undelivered electronic mail features, conducting periodic reviews or surveys to confirm receipt of the transmitted information)[.]" 29 C.F.R. § 2520.104b-1.

In addition, "an ERISA claim premised on the complete absence of an SPD . . . requires a showing of likely prejudice." Watson v. Consol. Edison Co. of New York, 374 Fed. App'x 159, 163 (2d Cir. 2010) (quoting Weinreb v. Hosp. for Joint Diseases Orthopaedic Inst., 404 F.3d 167, 171 (2d Cir. 2005)) (alteration in original). For example, "where the evidence shows that the claimant had actual knowledge of the requirement at issue, any error [in failing to provide the SPD] is necessarily harmless." Weinreb, 404 F.3d 167, 171-72 (2d Cir. 2005). In addition, where the plaintiff would not qualify for the ERISA benefits at issue, then a Court will find that there was no prejudice caused by a defendant's failure to provide an SPD. See id. ("A suit for benefits due under the terms of an ERISA-governed plan necessarily fails where the participant does not qualify for those benefits . . . .") (citing Strom v. Goldman, Sachs & Co., 202 F.3d 138, 142 (2d Cir. 1999))

**2. As to Whether the Defendant Properly Furnished the SPD to the Plaintiffs**

The Defendant asserts that in 2009, it distributed the SPD for the LTD Plan by mail, and therefore satisfied its disclosure obligations under ERISA. (Id.); see also Simeon v. Mount Sinai Med. Ctr., 150 F. Supp. 2d 598, 602 (S.D.N.Y. 2001) ("A number of courts have held that notice through first class mail is sufficient to inform a terminated employee of his right to continued health coverage.") (collecting cases). In so doing, the Defendant relies (i) on McGuinness's deposition testimony, during which she stated, "Whenever a new plan document of any kind was initiated or formed, the entire population would receive it" (McGuiness Dep. Tr. 17:10–12); and

Edelstein's representation in her declaration that the Defendant mailed the LTD policy to all of its employees in 2009 (Edelstein Decl. at ¶ 3.)

However, the Plaintiff testified at her deposition that she did not receive the SPD by mail or any other method prior to March 2010. (D'Iorio Tr. 151:17–22; 152:24–153:13.) Furthermore, the Defendant's correspondence with her supervisors and employees in the Defendant's Human Resources department could reasonably be read to suggest that the SPD was not mailed to employees. For example, in a January 21, 2010 email to the Plaintiff, Delvin stated, "Erin [McGuinness] [] sent me a 45 page document but asked me not to forward as different employees fall under different plans based on salary level and other such things . . . ." (Whitman Decl., Ex. V.) Similarly, in a March 11, 2010 email to Duca, McGuiness asked, "Janet D'Iorio is looking for LTD information. Is it okay to send her this?" McGuinness responded, "She is looking for the plan document . . . . If she needs it now-before I send [it] to her, it is on Sharepoint: Unum disability plan document." Both of these statements could reasonably be read to suggest that the Defendant did not, as a matter of course, furnish its employees with the SPD by mail but, rather, expected them to log onto Sharepoint to obtain it. Therefore, the Court finds that the Plaintiff has "set out specific facts showing a genuine issue for trial" as to whether in 2009, the Defendant mailed the SPD to its employees. <u>Safa</u>, 2014 WL 4274071 at *5.

The Defendant next contends that it satisfied its disclosure obligations under section 104(b)(1)(A) of ERISA by posting the SPD for the Unum LTD Plan on SharePoint and giving its employees notice that they could access the document on the site. (The Def.'s Mem. of Law at 6.) In particular, the Defendant's 2008 and 2009 Employee Handbooks stated, "Summary Plan Descriptions can be found on the Intranet under Human Resources or directly from the Human

Resources Department." (Whitman Decl., Ex. Q, at 62.) Further, on June 12, 2008 and May 18, 2009, respectively, the Plaintiff signed a form acknowledging that she "received and read a copy of the Company Employee Handbook." (Whitman Decl., Exs. B, S.)

In addition, in a March 11, 2010 email, McGuinness responded to a question from Duca, "[The Plaintiff] is looking for the plan document . . . . If she needs it now-before I send [it] to her, it is on Sharepoint: Unum disability plan document." (Ostrove Decl., Ex. 8.) This statement also suggests that the SPD had always been available to employees on Sharepoint.

However, the Court finds that even if the Plaintiff had access to the SPD for the Unum policy on SharePoint, the Defendant would not be entitled to judgment as a matter of law on the Plaintiff's claim that the Defendant breached its fiduciary duty by violating the disclosure provisions of ERISA § 104(b)(1)(A). The plan administrator — in this case, the Defendant — can disclose SPDs to its employees through "electronic media," but if they do so, they must also make "appropriate and necessary measures reasonably calculated to ensure . . . actual receipt of transmitted information." 29 C.F.R. § 2520.104b–1(b)(1). For example, the plan administrator can use "return-receipt or notice of undelivered electronic mail features, conducting periodic reviews or surveys to confirm receipt of the transmitted information." Id.

Here, there is nothing in the record to suggest that the Defendant took any action to confirm that its employees were able to obtain the SPD for the Unum LTD Plan on its internal website. As such, the Court cannot find that as a matter of law, the Defendant is entitled to judgment based solely on the fact that the Defendant uploaded the SPD for the Unum LTD Plan to Sharepoint. See Helton v. AT & T, Inc., 805 F. Supp. 2d 234, 245 (E.D. Va. 2011) aff'd, 709 F.3d 343 (4th Cir. 2013) (finding that the defendant had not complied with the disclosure requirements of ERISA because "[t]here is no evidence that the Plan administrator inquired

about or evaluated the mailing procedures, and the Committee seemed to rubberstamp without question the administrator's assertions that the materials were sent.").

Lastly, the Defendant argues that even if the Defendant did not satisfy its disclosure obligations under ERISA, the Plaintiff cannot show that she was prejudiced by the Defendant's failure because "she did not exercise due diligence in trying to understand her benefits before she began her disability leave." (The Def.'s Reply Mem. of Law at 3.)

However, in the cases cited by the Defendant, the plaintiffs had actual or constructive knowledge of the benefit requirement at issue. For example, in <u>Weinreb v. Hosp. for Joint Diseases Orthopaedic Inst.</u>, 285 F. Supp. 2d 382, 388 (S.D.N.Y. 2003) aff'd, 404 F.3d 167 (2d Cir. 2005), the court found no prejudice by the defendant-hospital's failure to provide the plaintiff's deceased husband with an SPD describing a required enrollment form. The Court based its finding on the fact that the doctor had been told on two separate occasions to complete the required form. <u>Id.</u>; <u>see also</u> <u>Robbins v. New York State Elec. & Gas Corp.</u>, No. 5:06CV0051(GTS/GJD), 2010 WL 1038495, at *5 (N.D.N.Y. Mar. 19, 2010) ("Finally, to the extent that [the] [p]laintiff alleges that the administrator failed to inform [the] [p]laintiff of some requirement, the Court finds that [the] [p]laintiff had knowledge of his requirements under the SPD based on his receipt of Handbooks [describing the requirement] every year prior to and including 2002.")

By contrast, here, there is conflicting evidence as to whether the Plaintiff was put on notice of the Defendant's policy that monthly benefits under the LTD Plan did not include an employee's commissions. In particular, under the LTD Plan administered by United of Omaha in place from 2002 through 2008, commissions were included in the monthly benefit calculation. Therefore, it would be reasonable to infer that the Plaintiff would not have known that the policy

changed in 2009 without receiving an SPD or being told directly of a change in the policy. (Ostove Decl., Ex. 32, at 1.)

Accordingly, the Court denies the Defendant's motion with respect to the Plaintiff's ERISA § 502(a)(3) claim that the Defendant violated the disclosure requirements in ERISA § 104(b)(1)(A).

## C. As to Whether the Defendant Made Material Misrepresentations

The Defendant also argues that the Plaintiff's breach of fiduciary claim based on allegations of material misrepresentation made by the Defendant should be dismissed because (i) the Defendant's employees were not acting in their fiduciary capacities when making the representations; (ii) the Plaintiff's claim is based on an omission, not an affirmative misrepresentation, and are therefore is not actionable; (iii) the misrepresentations were not material; and (iv) the Plaintiff cannot show that she was actually harmed by the misrepresentations. The Court disagrees.

### 1. Oral Misrepresentations and Representations Related to the Life Insurance Plan

To make a claim for a breach of fiduciary duty under ERISA based on a material misrepresentation, a plaintiff must show that "(1) the defendant "was acting as a fiduciary when taking the action subject to complaint; (2) the defendant's conduct breached a fiduciary duty; and (3) the plaintiff detrimentally relied on the defendant's material misrepresentation or omission." Levin v. Credit Suisse, Inc., No. 11–CIV–5252 (RJS), 2013 WL 1296312, at *2 (S.D.N.Y. Mar. 19, 2013) (quoting Bell v. Pfizer, Inc., 626 F.3d 66, 73–75 (2d Cir. 2010)) (internal quotation marks and alterations omitted).

In the complaint, the Plaintiff states that the Defendant's employees made the following representations regarding the LTD plan: (i) an oral statement by McGuiness in February 2010

that her benefits would be 66.6% of her income; (ii) an oral statement by Duca in September 2010 that her benefits would be based on her income; (iii) an oral statement by Duca in September 2010 that her benefits would be based on numbers from her earning statements; and (iv) two statements regarding the LTD Plan and Life Insurance policy made in a PowerPoint presentation given on December 1, 2008 and in January 2010. (Compl. at ¶¶ 10, 12, 18, 21, 23.)

The Defendant argues that none of these statements are actionable. (The Def.'s Mem. of Law at 14–22.) In her opposition memorandum, the Plaintiff only directly addresses the Defendant's argument with respect to the statements made in the PowerPoint presentation. She also makes a vague reference to an "email" but does not make clear what email she is relying on. Accordingly, the Court grants the Defendant's motion and dismisses the Plaintiff's misrepresentation claim to the extent that it relies on statements made by the Defendant outside of the December 1, 2008 PowerPoint presentation. See Reid v. Ingerman Smith LLP, 876 F. Supp. 2d 176, 186 (E.D.N.Y. 2012) ("This Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed") (quoting Arma v. Buyseasons, Inc., 591 F.Supp.2d 637, 643 (S.D.N.Y. 2008)).

The Plaintiff misrepresentation claim is also based on a representation in the December 1, 2008 PowerPoint presentation relating to the Defendant's life insurance policy. In particular, she alleges that the Defendant changed its life insurance carrier in 2009 to Unum and under Unum's policy, benefits were based on the employee's recoverable draw and not their gross earnings. (Compl. at ¶ 56.) The December 1, 2008 PowerPoint presentation did not include any information regarding the alleged change in policy; rather, it stated that its employees' life insurance benefits would be "1x annual earnings to a maximum of $150,000." (Ostrove Decl., Ex. 6.) Accordingly, the Plaintiff alleges that in reliance on this representation, she was

approved for a "less amount" of life insurance benefits than she would have been had she known of the policy regarding commissions. (Compl. at ¶ 56.)

However, the Plaintiff does not make clear what harm, if any, she suffered from the Defendant's alleged misrepresentation. Indeed, the Court notes that the Plaintiff has not qualified for any benefit payments under the Defendant's group life insurance policy because the policy only becomes effective when an employee dies. (Whitman Decl., Ex. J, at 2.) Without more, the Court must rely only on the Plaintiff's conclusory assertions of detrimental reliance. Buckley v. Deloitte & Touche USA LLP, 888 F. Supp. 2d 404, 415 (S.D.N.Y. 2012) ("Nonetheless, the party opposing summary judgment 'may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence' in support of its factual assertions.") (quoting D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir.1998)). Accordingly, the Court dismisses the Plaintiff's ERISA breach of fiduciary claim to the extent it relies on representations made regarding the Defendant's life insurance policy.

The Court will next address the parties' arguments with respect to the statements made in the Defendant's December 1, 2008 PowerPoint presentation relating to the LTD Plan.

**2. As to Whether the Defendant Was Acting as a Fiduciary**

The Defendant argues that the Plaintiff cannot demonstrate that the Defendant was acting in its fiduciary capacity when delivering the PowerPoint presentation to its employees because (i) the statements were not made by the Defendant's employees but a third party firm; and (ii) the act of "preparing presentation materials" is a purely ministerial act and cannot form the basis of a fiduciary duty claim under ERISA. (The Def.'s Mem. of Law at 16.)

The Plaintiff argues that the Defendant was acting as a fiduciary because (i) Edelstein was involved in reviewing and presenting the PowerPoint presentation and (ii) discussing future benefits with employees is not a ministerial act.

ERISA provides that a "'person is a fiduciary with respect to a plan,' and therefore subject to ERISA fiduciary duties, 'to the extent' that he or she 'exercises any discretionary authority or discretionary control respecting management' of the plan, or 'has any discretionary authority or discretionary responsibility in the administration' of the plan.'" Mahoney v. J.J. Weiser & Co., 564 F. Supp. 2d 248, 256 (S.D.N.Y. 2008) (quoting Varity Corp. v. Howe, 516 U.S. 489, 498, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996)); see also 29 U.S.C. § 1002(21)(A)).

"In order to establish a claim for breach of fiduciary duty under ERISA, the plaintiff must establish that the defendant is a fiduciary with respect to the particular activity at issue in the action." Denniston v. Taylor ex rel. administrator & fiduciary of Benckiser Consumer Products In. Grp. Life & Disability Income Ins. Plan, No. 98 CIV.3579(LTS), 2004 WL 226147, at *10 (S.D.N.Y. Feb. 4, 2004); Murray v. Nine Mile Point Nuclear Station, No. 5:07-CV-0147 GTS GHL, 2010 WL 3909472, at *17 (N.D.N.Y. Sept. 30, 2010) ("Under ERISA, a fiduciary is defined functionally: a party is a fiduciary 'to the extent' that he or she exercises discretion over the management of the plan or its funds or over its administration.") (citing Gillette Co., 524 F.3d 24, 29 (1st Cir. 2008)).

Therefore, the inquiry into whether an individual is a fiduciary under ERISA is a functional one: "the threshold question is . . . whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." Murray, 2010 WL 3909472 at *17 (citation omitted); see also Fastener Dimensions, Inc. v. Massachusetts Mut. Life Ins. Co., No. 12 CIV. 8918 (DLC), 2013 WL 6506304, at *3 (S.D.N.Y. Dec. 12, 2013)

("ERISA thus "defines 'fiduciary' not in terms of formal trusteeship, but in functional terms of control and authority over the plan."); <u>Gill v. Bausch & Lomb Supplemental Ret. Income Plan I</u>, No. 6:09-CV-6043 MAT, 2014 WL 823451, at *8 (W.D.N.Y. Mar. 3, 2014) aff'd, No. 14-1058, 2014 WL 6778391 (2d Cir. Dec. 3, 2014) ("Whether an individual or entity is acting as a 'fiduciary' can only be defined by reference to the functions they perform.").

In particular, "[f]alling outside the ambit of ERISA are those individuals 'who perform ministerial tasks with respect to the plan, such as the application of rules determining eligibility for participating, preparation of plan communication materials, the calculation of benefits, and the maintenance of employee records.'" <u>Gill</u>, 2014 WL 6778391 at *5 (quoting <u>Bell v. Pfizer</u>, 626 F.3d 66, 74 (2d Cir. 2010)); <u>see also</u> 29 C.F.R. § 2509.75–8 ("Therefore, a person who performs purely ministerial functions such as the types described above for an employee benefit plan within a framework of policies, interpretations, rules, practices and procedures made by other persons is not a fiduciary because such person does not have discretionary authority or discretionary control respecting management of the plan, does not exercise any authority or control respecting management or disposition of the assets of the plan, and does not render investment advice with respect to any money or other property of the plan and has no authority or responsibility to do so.").

The Defendant first argues that the Plaintiff cannot demonstrate that the Defendant was acting in its fiduciary capacity when delivering the PowerPoint presentation to its employees because the statements were not made by the Defendant's employees but by Mercer, a third party firm. The Court disagrees. Although the PowerPoint presentation was prepared by Mercer, Edelstein, a vice president of the Defendant's Human Resources Department, reviewed and approved it, and emailed a copy of it to all of the Defendant's employees. (Edelstein Dep. Tr.

37:11–25; Edelstein Decl., Ex. AA.)  There is also a dispute of fact as to whether Edelstein or a representative of Mercer delivered the PowerPoint presentation at the December 1, 2008 meeting with the Defendant's employees.  (Edelstein Dep. Tr. 36–37) ("Our broker, Mercer, puts together presentation . . . And typically, they will do the presentation.  I will be there.  In some instances when a Mercer rep cannot be there, I will do the presentation based off of their PowerPoint").

The Defendant also argues that the act of "preparing presentation materials" is a purely ministerial act and cannot form the basis of a fiduciary duty claim under ERISA.  (The Def.'s Mem. of Law at 16.)  The Defendant relies on a Department of Labor Interpretative Bulletin, which states that certain actions, including "[p]reparation of employee communications material," were ministerial and did not give rise to fiduciary duties.  29 C.F.R. § 2509.75-8

 However, the Plaintiff's misrepresentation claim is based on the Defendant's presentation of the PowerPoint and the representations in the PowerPoint itself, not merely the preparation of the PowerPoint.  Courts in this Circuit have held that discussing future benefits with potential employees can give rise to fiduciary duties under ERISA.  See, e.g., Flanigan v. Gen. Elec. Co., 242 F.3d 78, 84 (2d Cir. 2001) ("Communicating information about future plan benefits is indeed a fiduciary obligation . . . This Court has also held fiduciaries liable for non-disclosure of information about a current plan when the omitted information was necessary to an employee's intelligent decision about retirement."); Hudson v. Gen. Dynamics Corp., 118 F. Supp. 2d 226, 242 (D. Conn. 2000) ("Thus, while the consideration of plan changes and the decision itself may not be subject to fiduciary duties, communicating to employees about those potential changes is a discretionary act of plan management and administration that falls within the statutory definition of 'fiduciary' acts.") (citing Varity Corp. v. Howe, 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996)); cf. Livick v. The Gillette Co., 524 F.3d 24, 29 (1st Cir.

2008) ("On the face of the complaint, however, all Livick sought and received from Brundige was an estimate: his benefits had already accrued, he was not choosing among different options, and there was no discussion of the plan itself. This was purely a ministerial request.").

Here, there is no dispute that the PowerPoint presentation given at the December 1, 2008 meeting was intended to provide information to the Defendant's employees about its future benefits, including the LTD Plan. (Joint Statement of Facts at ¶ 31.) Accordingly, the Court holds that, as a matter of law, the Defendant can be held liable as a fiduciary under ERISA for alleged misrepresentations made in the PowerPoint presentation.

**3. As to Whether the Defendant's Representations Are "Material"**

The PowerPoint presentation that was sent and presented to the Defendant's employees contained the following representations regarding the Unum LTD Plan: (i) "66 2/3 % of monthly earnings to a maximum of $15,000 per month"; (ii) "Survivor Benefit"; (iii) "Dependent Care Benefit"; and (iv) "Paid by [the Defendant] at no cost to you." (Edelstein Decl., Ex. AA.)

The Plaintiff asserts that the first statement is misleading because the Defendant did not specify in the presentation that the definition for "earnings" had changed under the Unum LTD Plan. In particular, the Unum LTD Plan's definition of "earnings" did not include an employee's commissions, while the previous United of Omaha LTD Plan did include commissions in its definition of "earnings." (Ostrove Decl., Ex. 32, at 2; Whitman Decl., Ex. I.)

The Defendant asserts the statement is not material because, as a matter of law, an omission only satisfies the "materiality" requirement when the Defendant omits information in response to a question.

However, "[f]iduciaries may be held liable for statements pertaining to future benefits if the fiduciary knows those statements are false or lack a reasonable basis in fact." <u>Miller v. Int'l</u>

Paper Co., No. COTT12 CIV. 7071 (LAK), 2013 WL 3833038, at *4 (S.D.N.Y. July 24, 2013)

(citing Bilello v. JPMorgan Chase Retirement Plan, 649 F.Supp.2d 142, 165–66 (S.D.N.Y.

2009)).

For example, in Devlin v. Empire Blue Cross & Blue Shield, 274 F.3d 76, 90 (2d Cir.

2001), the Second Circuit vacated the district court's grant of summary judgment as to the claim

of a plaintiff-beneficiary against a defendant-employer for breach of a fiduciary duty under

ERISA. In that case, the plaintiff alleged that defendant stated repeatedly in letters to its

employees that its life insurance benefit remained constant for life without noting that the

defendant could reduce those benefits at any time. Id. at 88. The Court viewed these statements

as affirmative misrepresentations and found that "when a plan administrator affirmatively

misrepresents the terms of a plan or fails to provide information when it knows that its failure to

do so might cause harm, the plan administrator has breached its fiduciary duty to individual plan

participants and beneficiaries." (quoting In re Unisys Corp. Retiree Med. Benefit "ERISA"

Litig., 57 F.3d 1255, 1264 (3d Cir.1995)); see also Younger v. Zurich Am. Ins. Co., No. 11 CIV.

1173 TPG, 2012 WL 1022326, at *3 (S.D.N.Y. Mar. 26, 2012) ("[M]isleading statements

concerning an ERISA plan may support a claim for breach of fiduciary duty under ERISA.")

(citation omitted); Bilello v. JPMorgan Chase Ret. Plan, 649 F. Supp. 2d 142, 166 (S.D.N.Y.

2009) ("[The plaintiff] has stated a claim for fiduciary duty based on the Plan Administrator's

allegedly misleading and materially false statements that did not reveal that participants' benefits

under the cash balance plan formula were allegedly lower than their benefits under the Pre–1989

Plan and that a period of wear-away would occur.").

Similarly, in the instant case, the Defendant's representations in its PowerPoint

presentation related to changes to the employee's benefits in 2009. Prior to 2009, the

Defendant's LTD Plan included commissions in its calculation of benefits under the plan. (Ostrove Decl., Ex. 32, at 2.) However, as a result of the Defendant's decision to change policies, commissions were no longer included in the benefits calculation. (Ostrove Decl., Ex. 32, at 2; Whitman Decl., Ex. I.) On December 1, 2008 and in January 2010, the Defendant delivered a PowerPoint presentation to its employees which stated that an employee's monthly benefit under the new LTD plan would be "66 2/3 % of monthly earnings to a maximum of $15,000 per month." (Edelstein Decl., Ex. AA.) The presentation did not refer to the change in policy regarding commissions. (Id.) Under these circumstances, the Court finds that a reasonable fact finder could infer that the PowerPoint presentation was misleading and that the Defendant's failure to note a change in this policy could cause harm to its employees. See Devlin, 274 F.3d at 88 ("[The Defendant] may have still violated any fiduciary duties in its retiree letters and other communications which promised lifetime benefits but failed to note that Empire could reduce or terminate these benefits at any time.").

The Defendant relies on Burns v. Marley Co. Pension Plan for Hourly Emps., 663 F. Supp. 2d 135, 143 (E.D.N.Y. 2009). There, the court granted a Rule 12(b)(6) motion to dismiss a breach of fiduciary claim based on the Defendant's alleged failure to provide the Plaintiff with a correct estimate of his benefits. Id. The court noted that "[w]hile an employer can violate its fiduciary duty through an omission, courts have generally found an omission to be material only where an employee is given materially incomplete information in response to a question." Id. (collecting cases). Since the plaintiff never asked for any information about the estimate provided to him, the court found that the defendant had no affirmative duty to provide him with an accurate estimate. Id. at 144.

The Court does not find <u>Burns</u> to be applicable to the instant case. In that case, the Plaintiff's claim was based on an omission. <u>Id.</u> By contrast, in this case, the Plaintiff's claim is based on **an** affirmative and allegedly misleading statement, which courts in this Circuit have found can be actionable under ERISA. <u>See</u> <u>Devlin</u>, 274 F.3d at 88 ("[W]hen a plan administrator affirmatively misrepresents the terms of a plan or fails to provide information when it knows that its failure to do so might cause harm, the plan administrator has breached its fiduciary duty to individual plan participants and beneficiaries."); <u>Younger v. Zurich Am. Ins. Co.</u>, No. 11 CIV. 1173 (TPG), 2012 WL 1022326, at *3 (S.D.N.Y. Mar. 26, 2012) ("[M]isleading statements concerning an ERISA plan may support a claim for breach of fiduciary duty under ERISA."). Accordingly, the Court finds that, as a matter of law, the statement in the Defendant's PowerPoint presentation regarding monthly benefits under the LTD plan was misleading and therefore can subject the Defendant to liability under ERISA.

### 4. As to Detrimental Reliance

"Where a plaintiff asserts a breach of fiduciary claim based on a material misrepresentation or omission, the plaintiff must establish detrimental reliance." <u>Bell v. Pfizer, Inc.</u>, 626 F.3d 66, 75 (2d Cir. 2010) (quoting <u>King v. Pension Trust Fund of the Pension Hospitalization & Benefit Plan of the Elec. Indus.</u>, 131 Fed. Appx. 740 (2d Cir. 2005)). A related concept is materiality, which requires the Plaintiff to show a "'substantial likelihood' that the misrepresentation 'would mislead a reasonable employee in making an adequately informed decision'" about participating in the benefit program at issue. <u>Id.</u> (quoting <u>Caputo v. Pfizer</u>, 267 F.3d 181, 192 (2d Cir. 2001).

In the instant case, at the time of the December 1, 2008 presentation, the Plaintiff had chronic health issues related to her back and neck. (D'Iorio Dep. Tr. 102:16–20.) She had also

earned significant commissions in the past two years, and as a result, her gross earnings in 2007 and 2008 were in excess of $100,000 for each year.  (D'Iorio Dep. Tr. 241:2–13.)  The Plaintiff argues that had she known that the new LTD Plan adopted by the Defendant in 2009 calculated benefit payments based only on her recoverable draw and not her gross earnings, she would have sought to increase her recoverable draw or purchased additional insurance coverage.  (The Pl.'s Mem. of Law at 17.)  As a result, she claims that her long-term disability benefits were significantly lower that they would have been had the Defendant provided her with this information concerning the connection between her benefits and her draw amount.  (Id.)

However, the Defendant argues it was not reasonable for the Plaintiff to rely on the statement in the Defendant's December 1, 2008 PowerPoint presentation regarding changes to its LTD Plan because it was a small part of a large presentation, which consisted of forty-one slides.  (The Def's Mem. of Law at 19.)  The Court disagrees.

The Defendant held the December 1, 2008 Open Enrollment meeting to provide its employees with "an overview of certain benefits available to its employees."  (Joint Statement of Facts at ¶ 30.)  Indeed, in a November 26, 2008 email to employees attaching the presentation, Edelstein asked employees to "print [the PowerPoint presentation] out or have it up on your computer so you can read along as we present the benefit plans for 2009."  (Whitman Decl., Ex. AA).  Under such circumstances, the Court finds that a factfinder could conclude that the Plaintiff reasonably relied on one statement about the LTD Plan in the PowerPoint presentation in making decisions with respect to her benefits. Ballone v. Eastman Kodak Co., 109 F.3d 117, 122-23 (2d Cir. 1997) ("'[T]he ultimate inquiry is whether there is a 'substantial likelihood' that the affirmative misrepresentation 'would mislead a reasonable employee in making an

adequately informed decision about if and when to retire.'") (quoting <u>Kurz v. Philadelphia Elec.</u> <u>Co.</u>, 994 F.2d 136, 140 (3d Cir. 1993)).

The Defendant next argues that the Plaintiff was or should have been aware that the Unum LTD Plan did not include commissions based on the premiums that were deducted from her pay check on a bi-weekly basis.  In particular, beginning on January 1, 2009, when the Unum LTD Plan became effective, a $5.08 premium payment was deducted from each of the Plaintiff's pay checks.  (Joint Statement of Facts at ¶ 10.)  The amount deducted was calculated using a formula: ".00847% of [the employee's] annual salary." (Whitman Decl., Ex. K.)  The Defendant contends that the Plaintiff could have used this formula to determine that her benefits were based on her recoverable draw of $60,000, and not her gross earnings, including commissions.  (The Def.'s Mem. of Law 19–20.)  Again, the Court disagrees.

The Plaintiff asserts that she never thought to use this formula to determine her "Current Annual Salary" because her monthly premium payment of $5.08 was a "nominal amount." (D'Iorio Decl. at ¶ 4.)  Moreover, as described, *infra*, other employees, who also paid monthly LTD premiums, appeared to be not aware of the change in policy regarding commissions.  Therefore, the Court finds that a reasonable factfinder could conclude that the Plaintiff was not aware of the change in policy regarding commissions.

Lastly, the Defendant contends that the Plaintiff could not have increased her recoverable draw above $60,000 per year prior to going on disability leave. (The Def.'s Mem. of Law at 20–21.)  The Defendant relies on Edelstein's deposition testimony that the Defendant had a policy in place that a commissioned sales employee, like the Plaintiff, could only increase her "recoverable draw" up to 80 percent of 5.5 percent of that employee's prior year sales unless she

was able to demonstrate "extraordinary circumstances." (Edelstein Decl. at ¶ 5; Delvin Dep. Tr. 10:6–8.) In 2009, Plaintiff's sales were $1,348,443. (The Def.'s SOF ¶ 57.) The Defendant contends that pursuant to this formula, the Plaintiff's maximum draw for 2010 would have been $59,331, which is less than her actual 2010 draw amount of $60,000. (The Def.'s SOF ¶ 57.) As a result, the Defendant argues that even if the Court finds that the representations in the PowerPoint presentation to be misleading, the Plaintiff could not have been actually harmed by them because she could not have increased her recoverable draw above $60,000. (The Def.'s Mem. of Law at 20–21.)

However, the Plaintiff disputes that this policy existed. In addition to the Plaintiff's own testimony, Delvin, the Plaintiff's direct supervisor, stated in her deposition: "[Y]ou never want [the draw] to be too high relative to the prior year's sales, so you want to look at maybe 80 percent of the prior year's sales. But I can't say that that was any kind of hard-and-fast rule." (Delvin Dep. Tr. 10:6–10.) Similarly, in a September 29, 2010 email to Edelstein, Delvin wrote, "I know that you are aware of the situation that occurred with [the Plaintiff's] long-term disability, but as a recap, [the] disability insurance contract apparently reflected her draw and did not account for the substantial overage that she earned every year [in commissions] . . . . It would have been very easy to have had her draw raised. For the future, I think that we need to develop a standard formula to calculate commissioned reps['] draw." (Ostrove Decl., Ex. 13.) (emphasis added). Based on the testimony of Delvin and the Plaintiff, together with these emails, the Plaintiff has, at the very least, demonstrated a genuine issue of material fact as to whether she could have raised her draw to an amount high enough that she would have received greater monthly payments under the LTD Plan.

Accordingly, the Court finds that the Plaintiff has demonstrated a genuine issue of material of fact as whether the Plaintiff detrimentally relied on the Defendant's representation in its PowerPoint presentation relating to the Unum LTD Plan.

**D. As to the Defendant's Request to Limit the Plaintiff's Damages**

In its January 18, 2013 memorandum of decision and order, the Court denied the Defendant's motion to dismiss the Plaintiff's ERISA § 502(a)(3) claim. (Dkt. No. 14 at 14–16.) However, the Court found that the Plaintiff was entitled to monetary relief in the form of a "surcharge remedy" but not entitled to monetary relief under the theories of equitable estoppel or reformation. (Id.)

In the present motion, the Defendant states that the Plaintiff has represented to the Defendant in its expert report that she will seek as damages (i) a lump sum payment consisting of both the shortfall in past LTD payment and (ii) an amount reflecting the expected shortfall in future LTD payments discounted to present value. (The Def.'s Mem. of Law at 23.) The Defendant argues that awarding the Plaintiff damages for future payments under the LTD Plan would be inconsistent with nature of a surcharge remedy, which is equitable and can only make the Plaintiff whole, not compensate for future loss. (Id.) It further contends that it is not possible to determine what the Plaintiff's payments under the LTD plan will be because she is only eligible for benefits under the Plan so long as she is disabled, and if her condition improves, she may no longer be eligible to participate in the Plan. (Id.) Accordingly, the Defendant seeks an order pursuant to Fed. R. Civ. 56(g) that limits the Plaintiff's damages at trial to "(i) a monetary payment equal to the difference between the total LTD benefits [the Plaintiff] would have received through the date of judgment, plus interest; and (ii) an order requiring that [the]

Plaintiff's future LTD benefits be paid in the manner consistent with this Court's factual findings regarding how Plaintiff would have acted had the breach not occurred[.]" (Id. at 24.)

In response, the Plaintiff argues that she is entitled to additional measures of damages under a surcharge theory, including punitive damages to deter future breaches by the Defendant. (The Pl.'s Mem. of Law at 22.)

### 1. Legal Standards

The Fed. R. Civ. P. 56(g) provides, "[i]f the court does not grant all the relief requested by the motion, it may enter an order stating any material fact — including an item of damages or other relief — that is not genuinely in dispute and treating the fact as established in the case." "'The purpose of [the rule] is twofold: to salvage some of the judicial effort involved in the denial of a motion for summary judgment and to streamline the litigation process by narrowing the triable issues.'" In re Bak, No. 10-23045 (ASD), 2013 WL 653073, at *3 (Bankr. D. Conn. Feb. 20, 2013) (quoting Geneva Int'l Corp. v. Petrof, Spol, S.R.O., 608 F.Supp.2d 993 (N.D.Ill. 2009)) (alteration in original). The decision of the Court to enter an order limiting relief under Rule 56(g) "is a matter of discretion." Id. (citation omitted); see also Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Ready Pac Foods, Inc., 782 F. Supp. 2d 1047, 1051 (C.D. Cal. 2011) ("Rule 56(g) allows a court to grant partial summary judgment, thereby reducing the number of facts at issue in a trial. Fed.R.Civ.P. 56(g).") (citation omitted).

In this Court's January 18, 2013 memorandum of decision and order, the Court denied the Defendant's motion to dismiss the Plaintiff's breach of fiduciary claim under ERISA 502(a)(3), 29 U.S.C. 1132(a)(3). (Dkt. No. 14 at 8.). The Court found that the Plaintiff was entitled to monetary relief under ERISA § 502(a)(3) in the form of a "surcharge remedy" but not entitled to monetary relief under the theories of equitable estoppel or reformation. (Dkt. No. 14

at 14–16.). ERISA § 502(a)(3) provides that a "participant, beneficiary, or fiduciary" may bring a civil action "to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." Id.

The Court begins by providing a brief overview of Cigna, CIGNA Corp. v. Amara, __ U.S. __ , 131 S. Ct. 1866, 179 L. Ed. 2d 843 (2011), a case that significantly altered the understanding of equitable relief available under ERISA § 502(a)(3). Kenseth v. Dean Health Plan, Inc., 722 F.3d 869, 876 (7th Cir. 2013).

In Cigna, the plaintiffs, who were retiring employees, brought suit against the defendant-employer seeking to prevent the adoption of a new retirement plan and alleging that the defendant breached its fiduciary duty to the plaintiff under §§ 102(a), 104(b), and 204(h) of ERISA by failing to give proper notice of changes to the plan. Id. at 1872–73. The district court found that the defendant had provided its employees with misleading disclosures related to the policy changes and thus had breached its fiduciary duty to the employees. Id. at 1874–75. The district court then reformed the new plan and ordered the defendant to pay benefits accordingly, relying on section § 502(a)(1)(B) as the source of its authority. Id. at 1875–76. ERISA § 502(a)(1)(B) provides that a "participant or beneficiary" may bring a civil action to "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C.A. § 1132 (West).

The United States Supreme Court vacated the district court's decision and remanded the case. Id. at 1882. It found that the district court did not have authority under ERISA § 502(a)(1)(B) to provide the relief the district court had granted because, among other things, that

section addressed enforcing the terms of the plan not altering or reforming the terms of the plan. Id. at 1877.

However, in *dicta*, the Supreme Court found that the type of remedies ordered by the district court may be available to the plaintiffs on remand under ERISA § 502(a)(3). Id. at 1879. It reasoned that the "appropriate equitable relief" in § 502(a)(3) refers to "those categories of relief . . . typically available in equity.'" Id. at 1878 (quoting Sereboff v. Mid Atl. Med. Servs., Inc., 547 U.S. 356, 126 S. Ct. 1869, 164 L. Ed. 2d 612 (2006)).

The Supreme Court noted that the district court's order altering the terms of the plan to avoid the contested changes was analogous to the remedy of "reformation," a "traditional power of an equity court . . . used to prevent fraud." Id. at 1879. It also found that the district court's order that the defendant could not deprive the plaintiff of benefits already accrued resembled the doctrine of equitable estoppel, which "operates to place the person entitled to its benefit in the same position he would have been in had the representations been true." Id. at 1880.

Finally, and relevant to the instant case, the Supreme Court approved of the district court's order requiring the "plan administrator to pay to already retired beneficiaries money owed them under the plan as reformed." Id. It reasoned that "[e]quity courts possessed the power to provide relief in the form of monetary 'compensation' for a loss resulting from a trustee's breach of duty, or to prevent the trustee's unjust enrichment." Id. (citing Restatement (Third) of Trusts § 95). The Supreme Court noted that this remedy had sometimes been called a "surcharge." Id. (citing Princess Lida of Thurn and Taxis v. Thompson, 305 U.S. 456, 464, 59 S.Ct. 275, 83 L.Ed. 285 (1939)) ("The court has the power to . . . to restore the amount expended for them to the trust estate, . . . [and] to surcharge him with losses incurred . . . ."); see also G. Bogert & G. Bogert, Trusts and Trustees § 862 (rev. 2d ed. 1995) ("For a breach of trust the

trustee may be directed by the court to pay damages to the beneficiary out of the trustee's own funds, either in a suit brought for that purpose or on an accounting where the trustee is surcharged beyond the amount of his admitted liability."). The Supreme Court further noted that "[t]he surcharge remedy extended to a breach of trust committed by a fiduciary encompassing any violation of a duty imposed upon that fiduciary . . . . Thus, insofar as an award of make-whole relief is concerned, the fact that the defendant in this case . . . is analogous to a trustee makes a critical difference." Id.

Subsequently, in this Court's January 1, 2013 memorandum of decision and order, the Court found that Cigna permitted the Plaintiff to seek damages pursuant to a "surcharge remedy" based on allegations that "her long-term disability benefits and life insurance benefits were significantly lower that they would have been had the Defendant provided her with this information concerning the connection between her benefits and her draw amount." (Dkt. No 14, at 15.)

### 2. As to the Plaintiff's Damages

Although the Second Circuit has found that Cigna permitted a plaintiff to obtain monetary damages under ERISA § 502(a)(3) pursuant to a surcharge theory, it has not defined the precise scope of damages available based on this theory. See Osberg v. Foot Locker, Inc., 555 Fed App'x 77, 81 (2d Cir. 2014) (recognizing surcharge remedy but declining to "decide whether [the plaintiff] would . . . be entitled to recovery under surcharge[.]").

The Defendant contends that the "surcharge" remedy is limited to restitution, and therefore, the Plaintiff damages are limited to the benefit payments she would have received had she been able to increase her recoverable draw to reflect the commissions that she earned. (The Def.'s Mem. of Law at 23–24.)

However, the Supreme Court in Cigna suggested that "surcharge" was a remedy intended to provide all manner of compensatory damages to a plaintiff at equity and was not, as the Defendant contends, limited to a "make-whole remedy" — "[e]quity courts possessed the power to provide relief in the form of monetary 'compensation' for a loss resulting from a trustee's breach of duty, or to prevent the trustee's unjust enrichment." CIGNA Corp. v. Amara, 131 S. Ct. 1866, 1880, 179 L. Ed. 2d 843 (2011) (citation omitted). Indeed, the sources relied on by the Supreme Court also suggest that equity courts awarded compensatory damages to plaintiffs for losses that may have occurred beyond restitution. For example the Restatement (Third) of Trusts, which the Supreme Court relied on, states, "[i]f a breach of trust causes a loss . . . the beneficiaries are entitled to restitution and may have the trustee surcharged for the amount necessary to compensate fully for the consequences of the breach." Restatement (Third) of Trusts § 95 (2012) (emphasis added); see also G. Bogert & G. Bogert, Trusts and Trustees § 862 ("In suits to collect money from a trustee for breach of trust, the direct damages will usually be measured by the difference between the value of the beneficiary's rights to principal and income before and after the breach, but consequential damages may also be awarded, and exemplary or punitive damages may be awarded where malice or fraud is involved.") (emphasis added); John H. Langbein, What ERISA Means by "Equitable": The Supreme Court's Trail of Error in Russell, Mertens, and Great-West, 103 Colum. L. Rev. 1317, 1337 (2003) ("Cases awarding money damages for consequential injury, either to the trust or to the beneficiary, exist in profusion in trust remedy law.").

Therefore, the Court concludes that, as a matter of law, the Plaintiff is entitled under a surcharge theory to consequential damages, exemplary, or punitive damages in limited circumstances where malice or fraud is involved. Cf. McCravy v. Metro. Life Ins. Co., 690 F.3d

176, 181 (4th Cir. 2012) ("We therefore agree with [the plaintiff] that her potential recovery in this case is not limited, as a matter of law, to a premium refund.").

However, the Court notes that if the Plaintiff succeeds at trial, she will have the burden of establishing damages. Based on the record, the Plaintiff will have a difficult burden proving that she is entitled to damages for future payments under the LTD Plan because, as the Defendant correctly points out, it is not possible to determine what the Plaintiff's payments under the LTD plan will be in the future as she is only eligible for benefits under the Plan so long as she is disabled, and if her condition improves, she may no longer be eligible to participate in the Plan. (The Def.'s Mem. of Law at 23.) Moreover, the Plaintiff's claim that she is entitled to punitive damages to deter future wrongdoing by the Defendant appears to be unsupported by the record in this summary judgment background. There are no facts before the Court that suggest that the Defendant acted maliciously in these matters. However, the Court, in its discretion, finds that such questions should be left to the factfinder at trial and not resolved on summary judgment. In re Bak, No. 10-23045 (ASD), 2013 WL 653073, at *3 (Bankr. D. Conn. Feb. 20, 2013) ("The decision of a court to enter an order [under Rule 56(g)] finding certain facts for purposes of the litigation is a matter of discretion, evident from the use of the word 'may' in the section.").

Accordingly, the Court denies the Defendant's motion as to the Plaintiff's damages.

**E. As to the Plaintiff's Request That the Court Reconsider Its Dismissal of the Plaintiff's Estoppel and Reformation Claims**

In supporting memorandum of law, the Plaintiff asks the Court to reconsider its January 18, 2013 order dismissing the Plaintiff's estoppel and reformation claims. (The Pl.'s Mem. of Law at 23.)

The law of the case doctrine "counsels a court against revisiting its prior rulings in subsequent stages of the same case absent cogent and compelling reasons such as an intervening

change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." Jackson v. New York State, 523 F. App'x 67, 69 (2d Cir. 2013). The Plaintiff apparently relies on the same arguments that she raised in opposition to the Defendant's motion to dismiss. Accordingly, the Court declines to reconsider its prior decision.

### III. CONCLUSION

For the foregoing reasons, it is hereby:

**ORDERED**, that the Defendant's motion for summary judgment pursuant to Fed. R. Civ. P. 56(a) regarding the Plaintiff's claims under ERISA § 502(a)(3) relating to the Defendant's alleged failure to disclose the SPD and the Defendant's alleged misrepresentations in the December 1, 2008 PowerPoint presentation relating to the Defendant's LTD Plan, is denied; and

**ORDERED**, that the Defendant's motion for summary judgment pursuant to Fed. R. Civ. P. 56(a) with respect to the Plaintiff's claims under ERISA § 502(a)(3) regarding oral misrepresentations and misrepresentations in the December 1, 2008 PowerPoint presentation relating to the Defendant's life insurance plan, is granted; and

**ORDERED**, that the Defendant's motion pursuant to Fed. R. Civ. P. 56(g) is denied.

**SO ORDERED.**
Dated: Central Islip, New York
December 26, 2014

_/s/ Arthur D. Spatt_
ARTHUR D. SPATT
United States District Judge